O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

CALIFORNIA HOSPITAL
ASSOCIATION; ET AL; et al.,

              Plaintiffs,

vs.

TOBY DOUGLAS; et al.;

              Defendants.

_____

Case No. CV 11-9078 CAS (MANx)

**ORDER GRANTING
PRELIMINARY INJUNCTION**

## I.    INTRODUCTION AND BACKGROUND

On November 1, 2011, plaintiffs filed the instant action against Toby Douglas, Director of the California Department of Health Care Services (the "Director") and Kathleen Sebelius, Secretary of the U.S. Department of Health and Human Services (the "Secretary").  Plaintiffs filed their First Amended Complaint ("FAC") on November 18, 2011.

The California Department of Health Care Services ("DHCS") is a California agency charged with the administration of California's Medicaid program, Medi-Cal. The Secretary is responsible for administering the Medicaid program at the federal level. Through her designated agent, the Centers for Medicare and Medicaid Services

("CMS"), the Secretary is responsible for reviewing and approving policy changes that states make to their Medicaid programs.

Plaintiff California Hospital Association ("CHA") is a trade association representing the interests of hospitals in the State of California.  Many of CHA's member hospitals operate skilled nursing facilities that are distinct units within the hospital, commonly referred to as "DP/NFs."  Plaintiffs G.G., A.G., I.F., R.E., and A.W. are beneficiaries of the Medi-Cal program who require skilled nursing services.

On March 25, 2011, California Governor Edmund G. Brown Jr. signed into law Assembly Bill 97 ("AB 97"), the health budget trailer bill for California fiscal year 2011–2012.  AB 97 enacted significant payment reductions for many classes of services provided under the Medi-Cal program.  Most significantly for the purposes of the instant action, AB 97 enacted California Welfare and Institutions Code § 14105.192, which authorizes the Director to reduce the Medi-Cal payment rates for various categories of services, effective June 1, 2011.  Most of the rate reductions called for are flat 10 percent reductions.  However, pursuant to Welfare and Institutions Code § 14105.192(j), reimbursement for certain services may not exceed the reimbursement rates that were applicable to those claims of providers in the 2008–09 rate year, reduced by 10 percent. Among the services impacted by this provision are DP/NF services.

DHCS submitted proposed State Plan Amendment ("SPA") 11-010 to CMS on June 30, 2011, seeking federal approval of the rate reduction and incorporation of that reduction into California's Medi-Cal State Plan.  On September 27, 2011, CMS issued a letter to DHCS requesting additional information concerning the proposed rate reduction.  This Request for Additional Information ("RAI") focused on the impact of the rate reduction on access to services.  DHCS responded with an "Access Analysis" and a plan for monitoring access.  On October 27, 2011, in a letter from the Associate Regional Administrator of the Division of Medicaid & Children's Health Operations, CMS provided notice to the Director and DHCS that it had approved the SPA.

/ / /

1   Plaintiffs seek a declaration that the rate reduction violates the Takings Clause of

2   the Fifth Amendment to the United States Constitution, the Takings Clause of the

3   California Constitution,[1] numerous provisions of the Medicaid Act,[2] and the

4   Administrative Procedure Act ("APA"), 5 U.S.C. § 706 et seq.  Prayer for Relief ¶ 1.

5   Plaintiffs further seek a declaration that it was arbitrary, capricious, and an abuse of

6   discretion for the Secretary to approve the SPA incorporating the rate reduction into

7   California's State Plan.  Id. ¶ 2.  Plaintiffs also request that the Court set aside the

8   Secretary's approval, and enjoin the Director from effectuating the rate reduction.  Id. ¶¶

9   3, 4.

10   On November 21, 2011, plaintiffs filed the present motion seeking a preliminary

11   injunction restraining the Director from implementing the rate reduction.  On December

12   2, 2011, the Court denied the Director's ex parte application for a stay of the

13   proceedings.  On December 5, 2011, the Director and the Secretary filed separate

14   oppositions to plaintiffs' motion.[3]  Plaintiffs replied on December 9, 2011.  The Court

15   heard oral argument on December 19, 2011.  After carefully considering the parties'

16   arguments, the Court finds and concludes as follows.

17   / / /

18

19   _____

20   [1] Cal. Const. art. 1, § 19.

21   [2] Specifically, plaintiffs allege violations of 42 U.S.C. § 1396a(a)(8) ("Section
     (a)(8)"), 42 U.S.C. § 1396a(a)(19) ("Section (a)(19)"), and 42 U.S.C. § 1396a(a)(30)(A)
22   ("Section 30(A)").

23   [3] Contemporaneously with his opposition, the Director submitted evidentiary
24   objections to substantially all of plaintiffs' declarations in support of their motion for
     preliminary injunction.  Dkt. No. 44.  The Director argues that plaintiffs' declarations are
25   inadmissible because they are irrelevant, not based on personal knowledge, improper
26   opinion testimony by a lay witness, and include inadmissible hearsay evidence.  Id.  To the
     extent the Court relies on evidence contained within plaintiffs' declarations, as noted
27   below, the Director's objections are overruled.  The Director's other objections are
28   overruled as moot.

**II.   LEGAL STANDARD**

A preliminary injunction is an "extraordinary remedy."  <u>Winter</u> v. <u>Natural</u> <u>Res.</u> <u>Def.</u> <u>Council,</u> <u>Inc.</u>, 555 U.S. 7, 9 (2008).  The Ninth Circuit summarized the Supreme Court's recent clarification of the standard for granting preliminary injunctions in <u>Winter</u> as follows: "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  <u>Am.</u> <u>Trucking</u> <u>Ass'n,</u> <u>Inc.</u> v. <u>City</u> of <u>Los</u> <u>Angeles</u>, 559 F.3d 1046, 1052 (9th Cir. 2009); <u>see</u> <u>also</u> <u>Cal.</u> <u>Pharms.</u> <u>Ass'n</u> v. <u>Maxwell-Jolly</u>, 563 F.3d 847, 849 (9th Cir. 2009) ("<u>Cal.</u> <u>Pharms.</u> <u>I</u>").  Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest."  <u>Alliance</u> <u>for</u> <u>the</u> <u>Wild</u> <u>Rockies</u> <u>v.</u> <u>Cottrell</u>, 632 F.3d 1127, 1132 (9th Cir. 2011); <u>see</u> <u>also</u> <u>Indep.</u> <u>Living</u> <u>Ctr.</u> of <u>So.</u> <u>Cal.</u> <u>v.</u> <u>Maxwell-Jolly</u>, 572 F. 3d 644, 657–58 (9th Cir. 2009) ("<u>ILC</u> <u>II</u>").  A "serious question" is one on which the movant "has a fair chance of success on the merits."  <u>Sierra</u> <u>On-Line,</u> <u>Inc.</u> <u>v.</u> <u>Phoenix</u> <u>Software,</u> <u>Inc.</u>, 739 F.2d 1415, 1421 (9th Cir. 1984).

**III.   DISCUSSION**

    **A.   Standing**

Before turning to the merits of plaintiffs' motion, the Court first addresses the Director's arguments that plaintiffs lack standing to bring this case.

        **1.   Concrete Injury**

The Director argues that plaintiffs have not alleged an "actual and imminent injury" because plaintiffs' alleged injury relies on a "tenuous thread of assumptions contingent upon possibilities."  Director's Opp'n at 2.

The Court rejects this argument because plaintiffs' alleged injuries are concrete rather than speculative or conjectural.  In order to establish standing to assert a claim, a plaintiff must: (1) demonstrate an injury in fact, which is concrete, distinct and palpable,

and actual or imminent; (2) establish a causal connection between the injury and the conduct complained of; and (3) show a substantial likelihood that the requested relief will remedy the alleged injury in fact.  See McConnell v. Fed'l Election Comm'n, 540 U.S. 93, 225-26 (2003).  In this case, plaintiffs allege that if implemented, the challenged rate reduction would inflict concrete financial injury on Medi-Cal participating hospitals.  See Indep. Living Ctr. of So. Cal. v. Shewry, 543 F. 3d 1050, 1065 (9th Cir. 2008) ("ILC I").  ILC I also establishes that Medi-Cal beneficiaries have standing to challenge a Medi-Cal rate reduction when they allege they will by "'put at risk of injury by implementation of the . . . payment cuts' because those cuts will reduce . . . access to quality services."  Id.  Accordingly, there can be little doubt that plaintiffs have Article III standing.

### 2.    Prudential Standing

The Director argues that plaintiffs' lack prudential standing to enforce Sections (a)(19)[4] and 30(A)[5] because plaintiffs seek to enforce rights belonging to a third party, CMS.  According to the Director, these Sections do not confer individual entitlements on any private parties, but instead serve as "yardsticks" by which the federal government

---

[4] Section (a)(19) states that a State plan for medical assistance must:

provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of recipients.

[5] Section 30(A) states in pertinent part that a State plan for medical assistance must:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

1    may assess a state's performance under the Medicaid Act.  Director's Opp'n at 3.

2    Moreover, to the extent that plaintiffs' claims rely on the Supremacy Clause, the

3    Director argues that they run afoul of the bar against considering generalized grievances

4    in that plaintiffs are not attempting to vindicate any right personal to them, but instead

5    invoke the Supremacy Clause as an "all-purpose cause of action to compel a state's

6    compliance with federal law." Id. at 4 (citing Valley Forge Christian Coll. v. Amer.

7    United for Sep. of Church and State, 454 U.S. 464, 483 (1982)).

8        The Court finds the Director's prudential standing arguments unavailing.  In

9    assessing prudential standing, a court need not "inquire whether there has been a

10   congressional intent to benefit the would-be plaintiff," but instead must determine only

11   whether the plaintiff's interests are among those "arguably . . . to be protected" by the

12   statutory provision. Nat'l Credit Union v. First Nat'l Bank & Trust Co., 552 U.S. 478,

13   489 (1998). This "zone of interest" test "is not meant to be demanding." Clarke v. Secs.

14   Indus. Ass'n, 479 U.S. 388, 399–400 (1987).  To this end, Section (a)(19) mandates that

15   state Medicaid agencies set policies consistent with the "best interests" of Medicaid

16   beneficiaries, while Section 30(A) establishes standards by which payments to providers

17   are set.  Accordingly, Medi-Cal beneficiaries and providers are undoubtedly within the

18   zone of interests protected by Sections (a)(19) and 30(A).  Further, the Court finds that

19   contrary to the Director's assertion, plaintiffs are not alleging a "generalized grievance."

20   This is so because plaintiffs have alleged that CHA's member hospitals and the

21   individual-beneficiary plaintiffs will be directly harmed by the implementation of the

22   rate reduction.

23                **3.    Associational Standing**

24        The Director maintains that CHA cannot establish associational standing.

25   Specifically, the Director argues that CHA does not have associational standing on

26   behalf of hospitals because any injury suffered by a hospital will be particular to that

27   hospital.  Director's Opp'n at 4–5.  The Director further contends that CHA does not

28   have standing on behalf of Medi-Cal beneficiaries because CHA represents the interests

of its member hospitals, rather than the patients of those hospitals, because CHA fails to allege how representing Medi-Cal recipients' interests is germane to CHA's purpose, and because whether an individual beneficiary has a claim under §§ (a)(8) and (a)(19) will require individualized determinations.  Id. at 5–6.

The Director's associational standing arguments also fail.  An association has standing to sue on behalf of its members if (1) they would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) participation by the individual members is not necessary to resolve the claim. Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1997).  The Ninth Circuit has recognized that when an association is pursuing an action for only declaratory and injunctive relief on behalf of its members, participation in the action by individual members is not required.  See Associated Gen'l Contractors of Am. v. Metropolitan Water Dist. of So. Cal., 159 F. 3d 1178, 1181 (9th Cir. 1998).  Here, plaintiffs are not seeking monetary relief, so participation of individual CHA member hospitals is not required.  Next, other courts have held that because individual medical providers would have third-party standing to represent the interests of their patients, associations representing those providers can also represent the interests of patients. See, e.g., Penn. Psychiatric Soc'y v. Green Spring Health Srvs., Inc., 280 F. 3d 278, 288–94 (3d Cir. 2002); New Jersey Protection & Advocacy v. New Jersey Dep't of Educ., 563 F. Supp. 2d 474, 481–84 (D.N.J 2008).  Accordingly, in this case, CHA's member hospitals would have standing to represent the interests of their Medi-Cal patients and therefore that CHA has standing to do the same.  More fundamentally, even if CHA did not have standing to represent Medi-Cal beneficiaries, it would not alter the Court's ability to reach the merits of the controversy because there are individual Medi-Cal beneficiaries who are plaintiffs to this case whose standing is not challenged.

Having rejected each of the Director's standing arguments, the Court now turns to the merits of plaintiffs' motion.

1

**B.     Likelihood of Success on the Merits**

2

    **1.     Plaintiffs' Section 30(A) Claim Against the Secretary**

3

    Plaintiffs argue that they are likely to succeed on the merits of their Section 30(A)

4 claim against the Secretary because CMS failed to apply controlling law in evaluating

5 SPA 11-010 and therefore acted arbitrarily and capriciously.

6

    Under the APA, a reviewing court must affirm an agency's determination unless it

7 is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

8 law." 5 U.S.C. § 706(2)(A). "A decision is arbitrary and capricious if the agency 'has

9 relied on factors which Congress has not intended it to consider, entirely failed to

10 consider an important aspect of the problem, offered an explanation for its decision that

11 runs counter to the evidence before the agency, or is so implausible that it could not be

12 ascribed to a difference in view or the product of agency expertise.'" O'Keefe's, Inc. v.

13 U.S. Consumer Prod. Safety Comm'n, 92 F. 3d 940, 942 (9th Cir. 1996) (quoting Motor

14 Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

15

    If a statute is silent or ambiguous with respect to a specific question, the issue for

16 the court is whether the agency's answer is based on a permissible construction of the

17 statute. Chevron U.S.A. v. NRDC, 467 U.S. 837, 842–43 (1984). Chevron deference is

18 required "when it appears that Congress delegated authority to the agency generally to

19 make rules carrying the force of law, and . . . the agency interpretation claiming

20 deference was promulgated in the exercise of that authority." United States v. Mead

21 Corp., 533 U.S. 218, 226–27 (2001).

22

    **a.     Cost Studies**

23

    Plaintiffs first contend that CMS's approval of SPA 11-010 was arbitrary and

24 capricious because CMS failed to consider whether DHCS relied on credible cost studies

25 and developed rates reasonably related to provider costs as the Ninth Circuit has held is

26 required under Section 30(A). Mot. at 9–10 (citing Orthopaedic Hosp. v. Belshe, 103 F.

27 3d 1491, 1492, 1496, 1500 (9th Cir. 1997) cert. denied, Belshe v. Orthopaedic Hosp.,

28 522 U.S. 1044 (1998)).

1    In opposition, the Secretary contends that CMS's contrary interpretation of

2    Section 30(A), upon which it based its approval of SPA 11-010, is entitled to Chevron

3    deference notwithstanding the Ninth Circuit's decision in Orthopaedic Hospital that a

4    state must consider "responsible cost studies."  According to the Secretary, she has

5    "consistently taken the position" that Section 30(A) does not require states to base

6    payment rates on the costs incurred by providers even though this interpretation has not

7    yet been incorporated into a final rule.  Secretary's Opp'n at 8.  The Secretary cites Nat'l

8    Cable & Telecom. Ass'n v. Brand X Internet Servs. ("Brand X"), for the principle that

9    "[a] court's prior judicial construction of a statute trumps an agency construction

10   otherwise entitled to Chevron deference only if the prior court decision holds that its

11   construction follows from the unambiguous terms of the statute and thus leaves no room

12   for agency discretion."  Id. (quoting Brand X, 545 U.S. 967, 982 (2005)).  Because the

13   Ninth Circuit has not held that its interpretation follows from the unambiguous terms of

14   the statute, the Secretary contends that her interpretation of the statute controls because it

15   was made within the context of an adjudication that would normally be afforded

16   Chevron deference.  Id. at 9–10.  The Secretary further argues that the Ninth Circuit has

17   held that the Secretary's interpretation of Section 30(A), which formed the basis of the

18   disapproval of a State Plan Amendment, is entitled to Chevron deference.  Id. at 10

19   (citing Alaska Dept. of Health and Social Servs. v. CMS, 424 F. 3d 931 (9th Cir. 2005)

20   ("Alaska")).  The Secretary contends that any distinction between the approval and the

21   disapproval of a SPA is irrelevant to whether Congress delegated interpretative authority

22   to the agency, thus mandating Chevron deference.  Id. at 11 n. 5.  The Secretary notes

23   also that the Court of Appeals for the District of Columbia Circuit has determined that

24   the Secretary's interpretation of the Medicaid statute made in connection with the

25   approval of an SPA is entitled to Chevron deference.  Id. at 11 (citing PhRMA v.

26   Thompson, 362 F.3d 817, 822 (D.C. Cir. 2004)).

27   / / /

28   / / /

9

Although the Court agrees with the Secretary that Section 30(A) leaves room for interpretation,[6] the Court does not believe the agency's interpretation is owed <u>Chevron</u> deference with respect to the approval at issue in this case.  In this respect, the Court finds significant that the Secretary's approval of SPA 11-010 did not involve a formal adjudication accompanied by the procedural safeguards justifying <u>Chevron</u> deference. Instead, the Secretary's issued her interpretation of Section 30(A) in a letter to DHCS. This kind of interpretation is of the very type for which the Supreme Court has declined to extend <u>Chevron</u> deference.  <u>See</u> <u>e.g.</u>, <u>Christensen</u> <u>v.</u> <u>Harris</u> <u>County</u>, 529 U.S. 576, 586–88 (2000) (holding that informal agency interpretations of a statute such as those contained in an opinion letter, policy statement, agency manuals, or enforcement guidelines, are not entitled to <u>Chevron</u>-style deference).  The Secretary's reliance on <u>Alaska</u> misplaced.  In <u>Alaska</u>, the Ninth Circuit deferred to the Secretary's interpretation of Section 30(A) and upheld the denial of a State Plan Amendment.  In finding that the CMS Administrator's final determination "carr[ied] the force of law" necessary for <u>Chevron</u> deference, the court highlighted "the formal administrative process afforded the State," with "opportunities to petition for reconsideration, brief its legal arguments, be heard at a formal hearing, receive reasoned decisions at multiple levels of review and submit exceptions to those decision."  <u>Alaska</u>, 424 F. 3d at 939.  None of these procedural safeguards was incorporated in the SPA approval process at issue in this case, in which there was no hearing, no record, no opportunity for interested parties to

/ / /

/ / /

---

[6] The Court notes that Section 30(A) does not explicitly mention provider costs or cost studies and that three other circuit courts have determined that CMS need not consider provider costs in deciding whether or not to approve a State Plan Amendment.  <u>See</u> <u>Rite Aid of Pa. Inc. v. Houstoun</u>, 171 F. 3d 842, 853 (3d Cir. 1999); <u>Methodist Hosps., Inc. v. Sullivan</u>, 91 F. 3d 1026, 1030 (7th Cir. 1996); <u>Minn. Homecare Ass'n v. Gomez</u>, 108 F. 3d 917, 918 (8th Cir. 1997) (<u>per curiam</u>).

present evidence, and no formal decision in which the Secretary set forth her reasoning.[7]

Accordingly, the Secretary's approval of SPA 11-010 did not include the "hallmarks of 'fairness and deliberation,'" to which Chevron deference is owed. See Alaska, 424 F. 3d at 939 (quoting Mead, 533 U.S. at 226–27).[8]

The Court does not believe that the Court of Appeals for the District of Columbia Circuit's determination in PhRMA, 362 F.3d at 822, compels a contrary result in this case. Here, the decision of the Associate Regional Administrator of the Division of Medicaid & Children's Health Operations approving the SPA, as set forth in the October

---

[7] 42 U.S.C. § 1316(a), which governs CMS's consideration of State Plan Amendments, does not require any type of hearing when the Secretary approves a State Plan Amendment. 42 U.S.C. § 1316(a)(1). In contrast, where the Secretary rejects a State's proposed Amendment, the State is entitled to petition the Secretary for reconsideration of the issue, and the Secretary is required to hold a hearing. 42 U.S.C. § 1316(a)(2). For this reason, Chevron deference is more appropriate for the disapproval of a State Plan Amendment.

[8] The Secretary's reliance on Dickson v. Hood, 391 F. 3d 581 (5th Cir. 2004), Harris v. Olszewski, 442 F. 3d 456, 460 (6th Cir. 2006), and West Virginia v. Thompson, 475 F. 3d 204, 210–11 (4th Cir. 2007) is similarly misplaced. In Dickson, a Medicaid recipient alleged that the Louisiana Department of Health and Hospitals violated his federal rights by refusing to pay for medically prescribed disposable incontinence underwear. Id. at 584. The court merely afforded deference to the Secretary's interpretation of "home health care services" as embodied in a regulation previously promulgated pursuant to formal notice-and-comment rulemaking. Id. at 594. Harris involved a challenge to Michigan's single source provider contract for incontinence supplies as violating the Medicaid Act's freedom of choice provisions. 442 F. 3d at 460. West Virginia v. Thompson merely held that the Secretary's interpretation of the Medicaid statute as embodied in the *disapproval* of a SPA was entitled to deference. None of these cases involved a challenge to the Secretary's approval of a State Plan Amendment or the appropriate level of deference required to be afforded to such approvals.

Similarly, the Supreme Court's decision in Chase Bank U.S.A, N.A. v. McCoy, 131 S. Ct. 871 (2011), cited by the Director for the proposition that an agency's amicus brief deserves deference, does not compel a contrary result. This is so because that case involved an agency's interpretation of its own regulation rather than the statutory scheme itself. See id., 131 S. Ct at 880.

27 approval letter, is conclusory in nature. It does not provide any reasons on its face as to why provider costs should not be considered in determining whether the SPA's rate reduction will result in lower quality of care or decreased access to services. Given the logical and empirical relationship between reimbursement rates and the willingness of providers to make services available that the Ninth Circuit found was the case in Orthopaedic Hospital, the absence of a reasoned decision to not require cost studies to justify the SPA makes the decision to approve the SPA less appropriate for Chevron deference. Further, the record reflects that CMS states even though it "does not currently interpret [Section 30(A)] of the Act to require cost studies in order to demonstrate compliance," CMS is "currently reviewing and refining, in a rulemaking proceeding, guidance on how states can adequately document access to services," suggesting that a formal notice and comment rulemaking process, accompanied by the procedural safeguards of such a proceeding, is contemplated by CMS. See Dkt. No. 47-2, at 1; letter from CMS to DHCS. Besides the fact that no explanation is given for not requiring cost studies other than the statement that CMS "believe[s] the appropriate focus in on access," this statement by CMS suggests that its position regarding cost studies is not necessarily settled. Thus, as the court noted in PhRMA, Chevron deference may be warranted even when no administrative formality was required and none was afforded, the circumstances of this case call into question whether Chevron deference is appropriate.[9]

/ / /

/ / /

_____

[9] Further, in PhRMA, not only did the record support the reasonableness of the Secretary's decision that the SPA at issue would make it less likely that needy persons would become eligible for Medicaid, thereby impacting Medicaid services, the court noted that an intervening decision of the Supreme Court supported the trial court's decision to grant summary judgment in favor of the Secretary. 362 F. 3d at 821.

Having determined that Chevron deference is inappropriate, the Court now turns to whether the Secretary's interpretation that cost studies are not required under Section 30(A) is "entitled to respect" under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

The Court answers this question in the negative. Skidmore instructs that "[t]he weight accorded to an administrative judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control." 333 U.S. at 140. Skidmore respect is not owed for two reasons. First, in apparent conflict with the Secretary's position in this case, in Alaska, the Secretary asked the Ninth Circuit to uphold her disapproval of a State Plan Amendment because Alaska failed to analyze provider costs. Specifically, the Secretary argued:

> The requirements of § 1396(a)(30)(A) are . . . not so flexible as to allow the [State] to ignore the costs of providing services. For payment rates to be consistent with efficiency, economy, quality of care and access, they must bear a reasonable relationship to provider costs."

Alaska, Resp. Br., 2004 WL 3155124, at 32 (citing Orthopaedic Hospital, 103 F. 3d at 1499).[10] In addition to this inconsistency in agency position, the Secretary's proffered interpretation directly contradicts the law in the Ninth Circuit. See Orthopaedic Hospital, 103 F. 3d at 1497. Thus, while the Court recognizes that in appropriate circumstances, an agency may change its position on the construction of a statute, the Court finds that in light of the circumstances of this case, the Secretary's conclusory interpretation that Section 30(A) does not require consideration of cost studies is of limited "power to persuade," and is therefore not entitled to respect under Skidmore.

/ / /

---

[10] Importantly, under Skidmore, courts consider whether the agency has acted consistently. See Federal Express Corp. v. Holowecki, 552 U.S. 389, 399 (2008); Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993).

Accordingly, because CMS failed to consider whether DHCS relied on responsible cost studies, the Court finds that CMS failed to consider a relevant factor, and therefore that there is a strong probability that its approval of SPA 11-010 will be found to be arbitrary and capricious.

In any event, the Court finds that whether the Secretary's interpretation of Section 30(A) as embodied in the approval of SPA 11-010 is owed deference presents a "serious question going to the merits." See Alliance for the Wild Rockies, 632 F.3d at 1132; ILC II, 572 F. 3d at 657–58; Sierra On-Line, Inc., 739 F.2d at 1421.  In light of the balance of the hardships, which the Court believes tips strongly in plaintiffs' favor as discussed below, the Court finds that the issuance of a preliminary injunction is warranted.

### b.  Access

Plaintiffs next contend that even if the Secretary's approval of SPA 11-010 is owed deference, the approval still may be found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  Specifically, plaintiffs contend that the approval was arbitrary and capricious because DHCS failed to consider facts that bear on the impact of the rate reduction on access to services.  In particular, plaintiffs contend that the record demonstrates that the rate reduction would "devastate" access to skilled nursing care, especially in already underserved areas of the State.  Mot. at 11–12. Because many DP/NFs are located in remote areas, plaintiffs maintain that they are often the only reasonably available source of skilled nursing, such that if they close or reduce services, access will be unavailable or patients will be forced to travel significant distances.  Further, plaintiffs argue that DP/NFs frequently provide a higher level of skilled nursing care than the freestanding Skilled Nursing Facilities ("SNFs") that the State and CMS assert will absorb patients.  Id. at 12.  Plaintiffs maintain that DHCS's Access Analysis, on which CMS relied in approving SPA 11-010, is fatally flawed because inter alia: (1) it assumes complete interchangeability between freestanding SNFs and DP/NFs; (2) it evaluates access not by geographic location but instead by "geographic peer groups"; (3) it relies on non-predictive historical data; (4) it fails to

consider that the number of Medi-Cal beneficiaries who would be likely to require skilled nursing care is increasing substantially; (5) it assumes all licensed beds are available when facilities frequently have beds that are not staffed and therefore not available for care; and (6) it assumes a facility can operate at 100% capacity when this is untrue due to factors such as the gender or age of patients. Id. at 14–16.

In opposition, the Secretary argues that CMS reached a "considered conclusion" that SPA 11-010 does not violate Section 30(A) after a three-year process in which the State submitted a "thorough analysis" of the rate reduction's impact on access and a "comprehensive plan to measure and monitor access to services." Secretary's Opp'n at 14–15.[11] With respect to plaintiffs' criticism that DHCS failed to consider the differences between DP/NFs and freestanding SNFs, the Secretary argues that because federal law, state law, and state licensing and certification requirements do not distinguish between DP/NFs and freestanding SNFs, a difference in the type of care DP/NFs choose to provide cannot form the basis of a Section 30(A) violation. Id. at 16–17. Accordingly, the Secretary argues that so long as the payment levels suffice to allow SNFs to operate at the level required by federal and state law, there can be no access violation. Id. at 17. With regard to plaintiffs' charge that DHCS failed to evaluate access by geographic location, the Secretary contends that DHCS reasonably developed geographic peer groups for the purpose of clustering freestanding SNFs into county groupings with similar operating costs. Id. at 20–21. According to the Secretary, this approach allowed DHCS to determine whether access would be reduced in any

---

[11] Under the State's plan, DHCS will monitor a set of "early warning" measures, including change in Medi-Cal enrollment, provider participation rates, and calls to the Medi-Cal help line. Dkt. No 18-3, at 63–64. Any indication of a reduction in beneficiaries' access to SNF services would trigger a prompt response from DHCS, and if DHCS concludes that an access problem results from a reduction in payment, DHCS will "immediately take action to change the payment levels." Id. at 64. DHCS is required to abide by monitoring plan as a condition of CMS's approval of SPA 11-010, and CMS may initiate a compliance action if the State does not act. Dkt. No. 18-2, at 19–20.

particular type of geographic location. Id. at 21. Moreover, the Secretary contends that DHCS also evaluated access at "the statewide level," which would have been sufficient for CMS's approval. Id. (citing Methodist Hosps. v. Sullivan, 91 F. 3d 1026, 1029 (7th Cir. 1996) ("'Geographic area' could mean many things."). As to plaintiffs' contention that DHCS improperly relied on data regarding historic utilization and available capacity, the Secretary responds that historical data can reasonably be used to identify trends, and that by definition there is no data about actual future access. Id. at 22. In response to plaintiffs' assertion that DHCS failed to consider the aging Medi-Cal population, the Secretary notes that DHCS's monitoring plan specifically uses the percentage change in Medi-Cal enrollment to evaluate access. Id. n. 11. As to plaintiffs' contention that DHCS improperly assumed facilities could operate at full capacity, the Secretary responds that DHCS did not assume that a facility can have every available bed filled, but rather identified vacancy rates and determined only that sufficient capacity existed based on those rates. Id. at 23.

The Court finds that plaintiffs have shown a likelihood of success on the merits of their claim that CMS's approval based on its acceptance of DHCS's access analysis was arbitrary and capricious.[12] In this regard, the Court rejects the Secretary's argument that DP/NFs are interchangeable with SNFs. While the law may treat DP/NFs and SNFs as fungible, the record demonstrates that as a matter of fact, they are far from interchangeable. Accordingly, any conclusion by the Secretary and DHCS that freestanding SNFs could absorb patients from DP/NFs is belied by the record, making it likely that the Secretary's decision to approve SPA 11-010 was arbitrary and capricious. Similarly, the Court finds it likely that the Secretary's acceptance of DHCS's geographic peer group analysis will also be found to be arbitrary and capricious. This is so because DHCS's peer groups apparently have nothing to do with geographic proximity and

[12] The Court notes that counsel for the Secretary conceded at oral argument that if the State's access analysis were inherently flawed, the Secretary's decision to approve the SPA may be found arbitrary and capricious. Transcript of Oral Argument at 36: 13–15.

include hospitals from disparate regions of the state.  For example, Peer Group 3

includes both Plumas and Siskiyou Counties in northern and northeastern part of the

State and Ventura County in the south.  It is unreasonable to expect that any capacity in

Ventura County could offset DP/NF closures in Plumas and Siskiyou Counties.  As a

result, the peer groups provide minimal useful information about the availability of

skilled nursing services in any particular region of California.  Finally, the Court finds it

likely that the Secretary's acceptance of the monitoring plan as adequately ensuring

access to quality care will also be found arbitrary and capricious.  This is so because the

monitoring plan merely creates a potential response after an access problem has been

identified.  To the extent reduced rates cause DP/NFs to close their doors, increased rates

will not necessarily result in the reopening of those facilities.  More fundamentally,

during the period between the detection of an access problem and its potential remedy

through increased reimbursements, Medi-Cal beneficiaries will necessarily suffer from

reduced access to skilled nursing services.[13]

### c.    Quality of Care

Plaintiffs next argue that the record demonstrates "no consideration" at all by

DHCS or CMS of the impact of the rate reduction on quality of care.  Mot. at 16.  In this

regard, plaintiffs maintain that closure of DP/NFs, reductions in their bed capacity or

willingness to accept Medi-Cal patients, and reduction or elimination of specialized

services, means that patients requiring more complex services will not be able to obtain

appropriate care or will have to wait longer to obtain such services.  Further, plaintiffs

contend that the record shows that DP/NF patients have shorter lengths of stay, are

---

[13] Furthermore, whether the Secretary's acceptance of the access analysis and
monitoring plan as sufficiently ensuring access to skilled nursing services will be found to
be arbitrary and capricious at least presents a "serious question going to the merits."
Because the Court finds that the balance of hardships tips strongly in plaintiffs' favor, a
preliminary injunction is appropriate on this basis as well.  See Alliance for the Wild
Rockies, 632 F.3d at 1132; ILC II, 572 F. 3d at 657–58; Sierra On-Line, Inc., 739 F.2d at
1421.

1  readmitted to acute care settings less frequently, and have better outcomes than patients

2  in freestanding facilities.  Mot. at 16–17.

3       The Secretary responds that in the RAI, CMS specifically asked the State to

4  address concerns about the impact on quality of care.  Secretary's Opp'n at 18.

5  Furthermore, the Secretary contends that the State's monitoring plan repeatedly makes

6  clear that it does not simply address access to any care, but rather that it addresses access

7  to high quality care.  Id.  The Secretary notes also that the monitoring plan acknowledges

8  that "[p]rovisions in both Federal and State [law] mandate that administrators ensure

9  access to high quality healthcare for its Medi-Cal beneficiaries."  Id. (quoting Dkt. No

10  18-3 at 8).

11       The Court finds that plaintiffs have shown a high probability of success on the

12  claim that CMS's acceptance of the State's monitoring plan as sufficiently ensuring

13  quality of care was arbitrary and capricious.  First, as described above with respect to

14  access, the Court finds it likely that at best the monitoring plan creates a potential

15  response after a quality deficiency has been identified.  That is, while the monitoring

16  plan may alert the State that reimbursement rates must be increased to improve the

17  quality of skilled nursing services, at that point beneficiaries will necessarily have

18  already suffered injury.  Next, the Court finds it likely that the monitoring plan's reliance

19  on external assurances of quality will also be found to be flawed.  In Orthopaedic

20  Hospital, 103 F. 3d at 1497, the Ninth Circuit rejected the view that under Section 30(A),

21  it was reasonable to rely on independent provisions in federal and state law that ensure

22  quality of care.  Specifically, the court explained that "[t]he Department, itself, must

23  satisfy the requirement that the payments themselves be consistent with quality care."

24  Id.  For the reasons state above, the Secretary's contrary interpretation in this case is not

25  owed Chevron deference because the approval of a State Plan

26  / / /

27

28

Amendment does not include the "hallmarks of 'fairness and deliberation'" to which deference is owed. See Alaska, 424 F. 3d at 939 (quoting Mead, 533 U.S. at 226–27).[14]

## 2.   Plaintiffs' Section 30(A) Claim Against the Director

The Director argues that plaintiffs are unlikely to succeed on the merits of their Section 30(A) claim because they have no basis for asserting a private right of action under Section 30(A).  Director's Opp'n at 18.  The Director further contends that even if plaintiffs have a private right of action, they cannot demonstrate that AB 97 violates, and is thus preempted by, Section 30(A).  In support of this argument, the Director points to CMS's approval of SPA 11-010, which the Director contends is owed deference, and the concession of CHA's counsel at oral argument before the Supreme Court that if CMS were to approve an SPA, medicaid providers and recipients would not prevail in litigation.  Id. at 19 (citing Tr. Oral Arg. at 53, Douglas v. Indep. Living Ctr., No. 09-958).

At this juncture, the Director's argument that plaintiffs lack a private right of action to enforce Section 30(A) fails.  While plaintiffs lack a private right of action under 42 U.S.C. § 1983, see Develop. Servs. Network v. Douglas, No. 11-55851 slip op. at 20533 (9th Cir. Nov. 30, 2011), Ninth Circuit case law establishes that Section 30(A) is enforceable by private parties under the Supremacy Clause.  See ILC I, 543 F. 3d at 1050-52; ILC II, 572 F. 3d at 644; Cal. Pharms. I, 563 F. 3d at 850–51.  Although this issue is presently before the Supreme Court, unless and until this precedent is overruled, it controls here.  See Hart v. Massanari, 266 F. 3d 1155, 1171 (9th Cir. 2001).  For the reasons articulated in Section B(1) supra, the Court finds that plaintiffs are likely to

---

[14] Furthermore, whether the Secretary's acceptance of the monitoring plan as sufficiently ensuring quality will be found to be arbitrary and capricious at least presents a "serious question going to the merits."  Because the Court finds that the balance of hardships tips strongly in plaintiffs' favor, a preliminary injunction is warranted on this basis as well.  See Alliance for the Wild Rockies, 632 F.3d at 1132; ILC II, 572 F. 3d at 657–58; Sierra On-Line, Inc., 739 F.2d at 1421.

succeed on their claim that DHCS's failure to consider responsible cost studies, failure to adequately consider the effect of the rate reduction on access, and failure to appropriately consider the effect of the rate reduction on quality of care may be found to have violated Section 30(A).[15]  As discussed above, the Court finds that these issues at least present "serious questions as to the merits" of plaintiffs' claim, and that the balance of hardships tips strongly in plaintiffs' favor.  See Alliance for the Wild Rockies, 632 F.3d at 1132; ILC II, 572 F. 3d at 657–58; Sierra On-Line, Inc., 739 F.2d at 1421.

### 3.     Plaintiffs' Section (a)(8) Claim

Plaintiffs contend that the rate reduction violates Section (a)(8) because it will result in significant delays in the time that Medi-Cal beneficiaries will be able to access skilled nursing care.[16]  In support of this argument, plaintiffs cite Sobky v. Smoley, 855 F. Supp. 1123, 1149 (E.D. Cal. 1994) (". . . the insufficient funding by the State . . . has caused providers . . . to place eligible individuals on waiting lists for treatment.  This is precisely the sort of state procedure the reasonable promptness provision is designed to prevent.").

The Court finds that plaintiffs' Section (a)(8) claim is unlikely to succeed on the merits because Section (a)(8)'s "reasonable promptness" provision requires the expeditious processing of applications and payment rather than the provision of medical services.  In reaching this conclusion, the Court notes that although the Ninth Circuit has

---

[15] The Court reaches this conclusion in spite of the statement before the Supreme Court in Douglas v. Indep. Living Ctr. by CHA's counsel that litigation was unlikely to succeed if CMS approved a SPA.  That statement was made in another case, on an issue that had not been briefed prior to argument.  In addition, because the individual-beneficiary plaintiffs in this case were not involved in any way with Douglas v. Indep. Living Ctr. a statement by counsel for another party in those proceedings should not be deemed to be a concession by the individual-beneficiary plaintiffs here.

[16] Section (a)(8) states that a State plan for medical assistance must "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."

not ruled on the issue, the Fifth, Sixth, Seventh, and Tenth Circuits have all rejected the argument that Section (a)(8) guarantees prompt medical care and services to Medicaid recipients.  Equal Access for El Paso, Inc. v. Hawkins, 562 F. 3d 724, 727 (5th Cir. 2009); Westside Mothers v. Olszewski, 454 F. 3d 532, 540 (6th Cir. 2006); Bruggeman v. Blagojevich, 324 F. 3d 906, 910 (7th Cir. 2003); Oklahoma Chap. of the Amer. Acad. of Pediatrics v. Fogarty, 472 F. 3d 1208, 1214 (10th Cir. 2007).  Accordingly, the Court declines to follow the Sobky court's reasoning because it appears to be based on a flawed interpretation of the term "medical assistance."  See Brown v. Tenn Dep't of Fin. & Admin., 561 F. 3d 542, 544 (6th Cir. 2009) (rejecting finding in Sobky that term "medical assistance" meant medical services); Susan J. v. Riley, 616 F. Supp. 2d 1219, 1241 n. 24 (M.D. Ala. 2009) (declining to follow Sobky and finding it "not persuasive").[17]

### 4.   Plaintiffs' Section (a)(19) Claim

Plaintiffs argue that the rate reduction violates Section (a)(19), which mandates that Medicaid policies promote the "best interests" of beneficiaries.  According to plaintiffs, by justifying the reduction in part on the grounds that, even if some DP/NFs are forced to close, access will not decrease because patients can simply transfer to freestanding nursing facilities, DHCS does not act in the best interest of beneficiaries because this ignores the trauma beneficiaries will suffer as a result of such transfer.  Mot at 19, n. 3.

/ / /

---

[17] 42 C.F.R. § 435.911, the regulation implementing Section (a)(8), imposes specific deadlines for processing eligibility applications, providing further support for this interpretation. See Bruggerman, 324 F. 3d at 910 (noting that the regulation indicates that Section (a)(8) requires "prompt determination of eligibility and prompt provision of funds to eligible individuals" and not prompt treatment).

The Court finds that plaintiffs' Section (a)(19) claim is unlikely to succeed on the merits. This is so because Section (a)(19)'s "best interest" provision is too vague to create any objective benchmark for measuring whether the State has met its obligations. See Maynard v. Bonta, 2003 U.S. Dist. LEXIS 16201, at *97–*100 (C.D. Cal. 2003). Instead, the Section merely imposes a generalized duty on the states and expresses in general terms the overall goals of the program. Id.; Harris v. James, 127 F. 3d 993, 1010 (11th Cir. 1997).

### 5.    Plaintiffs' Takings Clause Claim

The "Takings Clause" of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "In order to state a claim under the Takings Clause, a plaintiff must first demonstrate that he possesses a 'property interest' that is constitutionally protected." Turnacliff v. Westly, 546 F. 3d 1113, 1118–19 (9th Cir. 2008) (internal citations omitted).

Plaintiffs contend that due to California's statutes that restrict the ability of nursing facilities to withdraw from Medi-Cal and cease operations,[18] the Director's failure to pay hospitals adequate rates for DP/NF services constitutes an unlawful taking of their property without just compensation. Mot. at 17. Specifically, plaintiffs contend that any skilled nursing facility that wants to close or withdraw from Medi-Cal must continue to treat Medi-Cal patients until they are: (1) transferred to another facility; (2) appropriately discharged; or (3) lose entitlements to Medi-Cal benefits. Id.

In opposition, the Director argues that it is well-settled in the Ninth Circuit that health care providers "do not possess a property interest in continued participation in

---

[18] Cal. Welf. & Inst. Code § 14022.4(3)(d) requires that no NP/NF facility may withdraw from the Medi-Cal program until "all patients residing in the facility at the time the facility filed [a] notice of intent to withdraw from the Medi-Cal program no longer reside in the facility."

Under Cal. Health and Safety Code § 1336.2, facilities that intend to close must transfer their residents to other facilities before they can cease operations.

1   Medicare, Medicaid, or the federally-funded state health care programs." Director's

2   Opp'n at 7 (quoting <u>Erickson</u> <u>v.</u> <u>U.S.</u> <u>ex</u> <u>rel.</u> <u>Dept.</u> <u>of</u> <u>Health</u> <u>and</u> <u>Human</u> <u>Services</u>, 67 F.

3   3d 858, 862 (9th Cir. 1995)). In this respect, the Director argues that CHA has failed to

4   establish a protected property interest because its member hospitals voluntarily

5   participate in the Medi-Cal program. <u>Id.</u> at 7–8 (citing <u>Burditt</u> <u>v.</u> <u>U.S.</u> <u>Dept.</u> <u>of</u> <u>Health</u>

6   <u>and</u> <u>Human</u> <u>Services</u>, 934 F. 2d 1362, 1376 (5th Cir. 1991) (quoting <u>Whitney</u> <u>v.</u> <u>Heckler</u>,

7   780 F. 2d 963, 972 (11th Cir. 1986)). According to the Director, CHA's member

8   hospitals "accepted the various restrictions to their services, including the statutory

9   requirements to continue treating Medi-Cal beneficiaries until they are placed in suitable

10  alternative facilities," such that there is no valid property interest subject to a Takings

11  Clause claim. <u>Id.</u> at 10.

12      The Court finds that plaintiffs have established a likelihood of success on their

13  Takings Clause claim. In reaching this conclusion, the Court finds that the cases the

14  Director cites for the principle that a Takings Clause claim is not viable when an entity

15  voluntarily participates in a regulated field are inapposite. <u>See, e.g.</u>, <u>Garelick</u> <u>v.</u>

16  <u>Sullivan</u>, 987 F. 2d 913, 917 (2d Cir. 1993); <u>Minn.</u> <u>Ass'n</u> <u>of</u> <u>Health</u> <u>Facilities,</u> <u>Inc.</u> <u>v.</u>

17  <u>Minn.</u> <u>Dep't</u> <u>of</u> <u>Public</u> <u>Welfare</u>, 742 F. 2d 442, 446 (8th Cir. 1984); <u>Franklin</u> <u>Mem'l</u>

18  <u>Hosp.</u> <u>v.</u> <u>Harvey</u>, 575 F. 3d 121, 129 (1st Cir. 2009); <u>Burditt</u> <u>v.</u> <u>U.S.</u> <u>Dep't</u> <u>of</u> <u>Health</u> <u>and</u>

19  <u>Human</u> <u>Services</u>, 934 F. 2d 1362 (5th Cir. 1991). For example, while the court in

20  <u>Franklin</u> <u>Mem'l</u> <u>Hosp.</u>, 575 F. 3d at 129, held that a state statute requiring hospitals to

21  provide free medical services to low-income patients was not an unconstitutional taking

22  because the hospital's participation in the state Medicaid program was voluntary, here

23  the hospitals' continued participation in Medi-Cal is compulsory at least until such time

24  as alternate arrangements are made for patients receiving skilled nursing services. And

25  while it is true that the hospitals in this case accepted the restrictions to their services

26  when they voluntarily elected to participate in Medi-Cal, they did so before the State

27  enacted AB 97. <u>See</u> <u>Georgia</u> <u>Nursing</u> <u>Home</u> <u>Ass'n</u> <u>v.</u> <u>State</u> <u>of</u> <u>Georgia</u>, 1997 WL

28  820966, *3 (N.D. Ga. Oct. 29, 1997) (noting that plaintiffs "may have a valid claim" if a

Georgia statute required them to continue treating Medicaid patients once they opt out of the Medicaid program).[19]

## C.   Risk of Irreparable Injury

Plaintiffs contend that the rate reduction will cause irreparable harm in a number of ways.  Plaintiffs first argue that beneficiaries will be injured because access to skilled nursing will be impaired.  According to plaintiffs, due to the rate reduction, many hospitals are planning to eliminate services, reduce hours and lay off employees, with some facilities having already taken such steps.  See, e.g., Declaration of C. Duane Duaner ¶¶ 6–8; Declaration of Andrew Jahn, ¶¶ 5–8; Declaration of David. A Neopolitan  ¶¶ 6, 10; Declaration of James J. Raggio, ¶¶ 9, 14; Declaration of Thomas Hayes, ¶¶ 9, 12; Declaration of Marieellen Faria, ¶¶ 4, 6.  Plaintiffs argue that these measures will adversely impact the availability of skilled nursing, as well as other categories of medical services, in a number of communities, many of which are already medically underserved.  See Dauner Decl., ¶¶ 6–8; Jahn Decl., ¶¶ 5–8; Neopolitan Decl., ¶¶ 6, 10; Raggio Decl., ¶¶ 9, 14; Hayes Decl., ¶¶ 9, 12; Faria Decl., ¶¶ 4, 6.  Plaintiffs further contend that the fact that multiple DP/NFs will close in response to the rate reduction requiring the transfer of patients causing "significant trauma and disruption" to many Medi-Cal beneficiaries, most of whom are physically or mentally frail.  See e.g., Declaration of E.H.D., ¶¶ 6–8; Declaration of D.F., ¶¶ 6–8; Declaration of D.X.P., ¶¶ 6–8; Declaration of E.M., ¶¶ 5–8.  Lastly, plaintiffs argue that CHA's member hospitals will be irreparably harmed by the rate reduction because they are barred from recovering any unlawfully withheld Medicaid payments from the State in federal court by virtue of

---

[19] At oral argument, counsel for the Director cited L.A. Haven Hospice, Inc. v. Leavitt, 2009 U.S. Dist. LEXIS 125308, *3 n.2 (C.D. Cal. July 13, 2009), aff'd in part and vacated on other grounds, 638 F. 3d 644 (9th Cir. 2011), for the proposition that providers have no takings claim where their participation in Medi-Cal is voluntary.  However, that case, like those cases cited in the Director's opposition, is inapposite because here, the hospitals' continued participation in Medi-Cal after the implementation of the rate reduction is at least temporarily compelled by state law.

1
2
3
4

the Eleventh Amendment.  Mot. at 24 (citing Cal. Pharms. I, 563 F. 3d at 851–52).  See also Declaration of Mary M. Forrest, ¶ 6 (projecting annual losses of $6.2 million due to rate reduction); Declaration of Daniel Ruth, ¶ 6 (projecting annual losses of $11 million).

5
6
7
8
9
10
11
12
13
14
15
16
17

In opposition, both the Secretary and the Director rely on the mitigating impact of the monitoring plan that California has adopted.  Secretary's Opp'n at 24; Director's Opp'n at 25.  Both defendants cite Midgett v. Tri-County Metro. Transp. Dist. of Or., 254 F. 3d 846, 850 (9th Cir. 2001) (holding that a defendant's procedures for monitoring compliance in the ADA context "show that Plaintiff does not face a threat of immediate irreparable harm without an injunction"), and argue that given the procedural safeguards of the monitoring plan, plaintiffs cannot prove irreparable harm as a result of the rate reduction.  Additionally, the Director argues that the injury to providers is not a proper basis for an injunction because providers are merely "indirect beneficiaries" of the program.  Director's Opp'n at 23.  Finally, the Director contends that the claims of irreparable harm to beneficiaries are based entirely on hearsay and conjecture that their current providers will stop treating them and that, in such event, they will not receive equal or better care at another facility.  Id.

18
19
20
21
22
23
24
25
26
27
28

The Court finds that plaintiffs have met their burden of showing irreparable harm in the absence of an injunction.  In reaching this conclusion, the Court rejects defendants' contention that California's monitoring plan will necessarily prevent beneficiaries from being harmed.  As discussed above, the Court believes that the monitoring plan at best presents a potential remedy *after* an access or quality problem has been detected.  Even if the monitoring plan could ensure that beneficiary access to services would not be reduced on the aggregate, the Ninth Circuit has held that as long as there is evidence showing that at least some Medi-Cal beneficiaries might lose services as a result of a rate reduction, irreparable harm is adequately demonstrated.  Cal. Pharms. Ass'n v. Maxwell-Jolly, 596 F. 3d 1098, 1114 (9th Cir. 2010) ("Cal. Pharms. II").  Here, plaintiffs have proffered substantial evidence that numerous DP/NF

providers will reduce their capacity or shutter their doors in response to the implementation of the rate reduction, suggesting that at least some beneficiaries would suffer reduced access to services.  Even if this were not the case, it is reasonable to infer that for many people requiring skilled nursing services, transfer to other facilities could itself inflict serious injury.  Furthermore, because CHA's member hospitals would be barred from recovering any reimbursement short fall in an action at law due to California's Eleventh Amendment immunity, the Court finds plaintiffs have shown adequate irreparable injury to support an injunction on this basis as well.  See Cal. Pharms. I, 563 F. 3d at 850–52.[20]

### D.   Balance of Hardships and Public Interest

Plaintiffs argue that the balance of equities and the public interest weigh in favor of entering an injunction.  In this regard, plaintiffs contend that the only interest the Secretary and Director can point to is the State's budget difficulties.  Mot. at 25 (citing ILC II, 572 F. 3d at 659; Cal. Pharms. I, 563 F. 3d at 852–853; Cal. Pharms. II, 596 F. 3d at 1114–15 for the proposition that a state's financial problems do not excuse continued violations of federal law with respect to Medicaid policy decisions).  Moreover, plaintiffs assert that where "'there is a conflict between financial concerns and preventable human suffering . . . , the balance of hardships tips decidedly in favor of the latter.'"  Id. (quoting Golden Gate Restaurant Ass'n v. City and County of San Francisco, 512 F. 3d 1112, 1126 (9th Cir. 2008)).

In opposition, the Secretary and Director each argue that injunctive relief would have a serious impact on the continuing financial health of the State of California.  Secretary's Opp'n at 25; Director's Opp'n at 26.  The Director also maintains that the public will suffer harm if an injunction issues because any injunction that prevents the  /

/ /

---

[20] In this respect, the Director's argument that monetary loss to providers cannot be a basis for an injunction is unavailing.  The Ninth Circuit has repeatedly rejected this precise argument.  See, e.g., Cal. Pharms. I, 563 F. 3d at 850–51; ILC II, 572 F.3d at 658; Cal. Pharms. II, 596 F. 3d at 1113–14.

1  implementation of a state statue inflicts injury on the State.  Director's Opp'n at 25

2  (citing <u>Coalition</u> <u>for</u> <u>Economic</u> <u>Equity</u> <u>v.</u> <u>Wilson</u>, 122 F. 3d 718, 719 (9th Cir. 1997)).

3  Although keenly aware of the State's fiscal difficulties, the Court believes that the

4  balance of the equities and the public interest strongly favor the issuance of an

5  injunction.  In reaching this conclusion, the Court notes that the Ninth Circuit has held

6  that the injury to a state caused by the injunction of one of its statutes does not outweigh

7  the public's interest in ensuring that state agencies comply with the law and protect

8  beneficiaries' access to services.  <u>ILC</u> <u>II</u>, 573 F. 3d at 658; <u>Cal.</u> <u>Pharms.</u> <u>II</u>, 596 F. 3d at

9  1114–15.  Similarly, the State's fiscal crisis does not outweigh the serious irreparable

10 injury plaintiffs would suffer absent the issuance of an injunction.  <u>See</u> <u>ILC</u> <u>II</u>, 573 F. 3d

11 at 658–59 ("State budgetary considerations do not . . . in social welfare cases, constitute

12 a critical public interest that would be injured by the grant of preliminary relief.  In

13 contrast, there is a robust public interest in safeguarding access to health care for those

14 eligible for Medicaid."); <u>Cal.</u> <u>Pharms.</u> <u>II</u>, 596 F. 3d at 1114–15.

15 **IV.    CONCLUSION**

16 In accordance with the foregoing, the Court hereby GRANTS plaintiffs' motion

17 for a preliminary injunction.

18 IT IS HEREBY ORDERED as follows:

19 Defendant Toby Douglas, Director of the California Department of Health Care

20 Services, his employees, his agents, and others acting in concert with him shall be, and

21 hereby are, enjoined and restrained from violating federal law by implementing or

22 otherwise applying the reduction on Medi-Cal reimbursement for skilled nursing

23 services rendered by distinct part hospital units on or after June 1, 2011, pursuant to

24 Assembly Bill 97 enacted by the California Legislature in March 2011, as codified at

25 California Welfare and Institutions Code § 14105.192(j), or to any other degree reducing

26 current Medi-Cal rates for skilled nursing services rendered by distinct part hospital

27 units.

28

1  IT IS HEREBY FURTHER ORDERED that, consistent with the foregoing, the

2  October 27, 2011 decision by Defendant Kathleen Sebelius, Secretary of the Department

3  of the United States Department of Health and Human Services, approving the Medi-Cal

4  reimbursement reduction codified at Welfare and Institutions Code § 14105.192(j), is

5  hereby stayed.

6

7  Dated: December 28, 2011

8  CHRISTINA A. SNYDER
   UNITED STATES DISTRICT JUDGE